J-S35004-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.G.F., JR., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: A.F., MOTHER | : | |
| | : | |
| | : | No. 663 MDA 2022 |

Appeal from the Decree Entered March 31, 2022
In the Court of Common Pleas of Dauphin County Orphans' Court
at No(s):  66 AD 2021

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.*

MEMORANDUM BY BENDER, J.:                **FILED NOVEMBER 03, 2022**

A.F. (Mother) appeals from the decree entered March 31, 2022, that granted the petition filed by the Dauphin County Social Services for Children and Youth (Agency) to involuntarily terminate Mother's parental rights to C.G.F., Jr. (Child), born in February of 2014, pursuant to sections 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1]  After review, we affirm.

In her brief, Mother set forth the following issue for our review:

1.  Did the trial court abuse its discretion, or commit an error of law by determining it was in the [Child's] best interest to have Mother's parental rights terminated by clear and convincing evidence?

Mother's brief at 4.

---

* Retired Senior Judge assigned to the Superior Court.

[1] The parental rights of C.G.F. (Father) were also terminated on the same date; however, Father did not appeal the termination.

We review an order terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). The burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 958 A.2d at 276. Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive opinion authored by the Honorable John F. Cherry of the Court of Common Pleas of Dauphin County, filed on July 8, 2022. We conclude that Judge Cherry's well-reasoned opinion properly disposes of the issue raised by Mother.[2] Specifically, the trial court's opinion extensively discusses the testimony provided at the various hearings held in this matter, including the testimony given by a number of caseworkers from the Agency, as well as that provided by the psychologists that treated Mother. Essentially, Mother's arguments center on the credibility determinations made by the court, contending that the testimony put forth by her should have been believed rather than the testimony provided by the Agency's witnesses. Our standard of review prohibits this Court from overturning the trial court's credibility determinations so long as its findings are supported by the evidence of record. In this case, the court's credibility determinations are supported by an overwhelming majority of the evidence. Accordingly, we adopt Judge Cherry's opinion as our own and affirm the decree appealed from on that basis.

---

[2] Notably, the Agency has been involved with this family since 2010. At the time the termination petition concerning Child was filed, petitions relating to six of Child's siblings were also filed. Mother and Father voluntarily relinquished their parental rights to these six children.

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/3/2022

IN THE INTEREST OF
C.G.F. Jr.,

FILED
JUL 08 2022
JEAN MARFIZO KING
REGISTER OF WILLS AND
CLERK OF THE ORPHANS' COURT

A Minor

: IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY. PENNSYLVANIA

: NO. DP-173-2017: 66-AD-2021
:
:
:

## TRIAL COURT OPINION

*A.F.*

These appeals of ~~A.F.~~ ("Mother"), follow the March 31, 2022, entry of the Final

Decree of termination of parental rights to C.G.F. born February 13, 2014. [1]

At the conclusion of the hearing on the Petition for Involuntary Termination of Parental

Rights, we set forth at length the reasons for termination of parental rights. (Transcript of

Proceedings, March 31, 2022 "N.T.", at pp. 97-111). We amplify those reasons in this Opinion.

## PROCEDURAL BACKGROUND

On May 7, 2021, Dauphin County Social Services for Children and Youth ("Agency") filed

Petitions for Involuntary Termination of Parental Rights as to C.G.F., Jr., as well as siblings,

A.L.F. (67 AD 2021), C.G.F (65 AD 2021), A.I.F. (64 AD 2021), G.M.F. (68 AD 2021), A.E.F.

(63 AD 2021), and A.A.F. (62 AD 2021) . [2] The Petition details at length the Agency's

extensive involvement with the family dating to 2010.

The Court conducted hearings as follows [3]:

*C.G.F.*

---

[1] Only Mother appeals the March 31, 2022, Decree. ~~C.G.F.~~ ("Father") did not appeal. We
found that Father did not present a scintilla of evidence that he cooperated with any of the court ordered
objectives. (N.T. 3/31/22, pp. 98-99).

[2] At a hearing conducted October 4, 2021, Mother and Father voluntarily relinquished their parental rights
to all of these children except C.G.F., Jr.. Father appealed the voluntary relinquishment but later withdrew
his appeal. Mother did not appeal.

[3] We deemed to necessary to review testimony taken at all hearings, including permanency review
hearings. We have filed the transcripts of permanency review hearing at the instant docket. The need to
obtain transcripts not previously requested delayed our filing of this Opinion.

1

Permanency Review Goal Change Hearing – November 4, 2019

Termination of Parental Rights/ Permanency Review Hearing- July 6, 2021

Termination of Parental Rights Hearing-September 7, 2021

Termination of Parental Rights Hearing- October 4, 2021

Permanency Review Hearing- December 2, 2021

Termination of Parental Rights Hearing- February 16, 2022

Permanency Review Hearing-Wednesday March 2, 2022

Termination of Parental Rights Hearing-March 31, 2022

## FACTUAL BACKGROUND

The Agency's history with Mother dates to 2010. Agency caseworker Noelle Barrett served as the family's caseworker in 2015 and 2016. (N.T. 7/6/21, p. 59). In 2016, the Agency referred the family to JusticeWorks' STOPP (Short-Term Therapeutic Outreach to Prevent Placement), a program to enable the family to access intensive support services and to the Community Action Commission. (N.T. 7/6/21, p. 59; p. 36). The Community Action Commission provided the family with locating housing resources, budgeting, and credit recovery. (N.T. 7/6/21, pp. 60-61). The Agency paid for lodging for the family in July 2016 and for the first months' rent in August 2016. (N.T. 7/6/21, p. 60). Mother did not work consistently with the Community Action Commission or STOPP. (N.T. 7/6/21, pp. 62-63). STOPP discharged Mother as unsuccessful for failure to communicate consistently. (N.T. 7/6/21, p. 63). During Ms. Barrett's tenure with the family, Mother did not want to work with the Agency. (N.T. 7/6/21, p. 68). Ms. Barrett last served as the family's caseworker in December 2016, although she visited the home in April 2019 while the children were in the home under Court Ordered Protective Services. (N.T. 7/6/21,

2

pp. 65-66). At that time, concerns existed regarding the eight children living in the basement and that drug use was occurring in the same room. [4](N.T. 7/6/21, p. 69).

Agency Supervisor Rebecca Tweet oversaw the Agency's involvement with the family beginning in 2017. (Transcript of Proceedings, July 6, 2021, "N.T., 7/6/21" pp. 34-36). The Agency worked with the family to address issues of truancy and to obtain educational, medical, and dental services. *Id.* The children were far behind in regular medical care. (N.T., 7/6/21, p. 35). The Agency assigned a caseworker to the family who could devote significant time to working with the family. *Id.*

On January 2, 2017, the Agency received a referral that Mother and Father left eight of their children in the care of an eleven-year-old, including a four-month-old, in the house for several hours, for which Mother was charged with eight felony counts of child endangerment. (N.T. 11/4/19, p. 6). Those charges were reduced to misdemeanors. (N.T. 11/4/19, p. 7). In November 2017, the children were removed from the home based upon ongoing concerns regarding Mother's heroin use. (N.T. 11/4/19, pp. 6-7; N.T. 7/6/21, p. 37).

The Agency provided rental assistance to Father to secure housing. (N.T. 7/6/21, p. 40). However, within several months, Father failed to pay rent and the family was evicted from their residence. (N.T. 7/6/21, pp. 37-38). At that time, the court issued a no-contact order as between Mother and Father. (N.T. 7/6/21, pp. 39-40). Father was required to find separate housing so that he could care for the children in a setting separate from Mother. *Id.* The no-contact order directed that Mother have only Agency supervised contact. (N.T. 7/6/21, p. 41). The Agency scheduled aids to visit the home frequently so that Mother could visit regularly. *Id.* Mother and Father frequently violated the no-contact order. (N.T. 7/6/21, p. 41). Father failed to cooperate to any

---

[4] Where used throughout this opinion, the term "children" includes C.G.F., Jr.

3

extent with services extended. (N.T. 7/6/21, p. 42). Father stated that he would not do anything, that the issues belonged to Mother. (*Id.*; p. 53). The concerns with housing, education, medical and dental needs remained. (N.T. 7/6/21, p. 43).

Mother resisted working with the Agency, resisted participating in a drug screen, and complained about the Agency services. (N.T. 7/6/21, p. 37). Mother and Father could not or would not acknowledge the concerns which existed. (N.T. 7/6/21, p. 41). The Agency spent significant time attempting to engage the family in services, offering family and group decision-making, and seeking to ensuring that the children's medical and education needs were addressed. (N.T. 7/6/21, p. 42). Mother and Father were unwilling to discuss participating in a family group conference. (N.T. 7/6/21, pp. 55-56). Because of the parents' resistance, the Agency deemed it necessary obtain court ordered objectives by way of a dependency petition filed September 18, 2017.

The Court established the following objectives:

1. Cooperate and comply with the Agency.

2. Resolve all criminal matters and refrain from any illegal activity.

3. Obtain and maintain a consistent source of legal income and provide proof of income to the Agency.

4. Obtain and maintain stable and affordable housing to ensure parents provide for children's basic needs.

5. Demonstrate ability to effectively manage finances.

6. Complete a psychological evaluation and follow and recommendations.

7. Provide the Agency with proof of working utilities.

8. Provide one drug screen a week, as well as any random urine screens requested by the Agency.

9. Cooperate and comply with STOPP

4

10. Cooperate with mental health services and attend appointments and meetings.

11. Participate in counseling to address deficits in relationship between ▓▓▓ ~~Father and~~
    ▓▓▓▓▓▓ Mother.

12. Successfully complete anger management skills through Sound Solutions.

13. Ensure that the children are up to date medically and dentally.

14. Notify the Agency within 24 hours of new residence or new contact information.


On July 19, 2017, Ms. Tweet introduced Agency caseworker Kaylie Petersheim, to whom the Agency assigned to the family to work with the family. (N.T. 7/6/21, p. 43). At the visit to the family's home, Ms. Tweet found it unusual that several of the children ran to Ms. Tweet and Ms. Petersheim and called them "Mommy". (N.T. 7/6/21, p. 44). Ms. Tweet supervised the case through approximately November 2017. *Id.* During her supervision, the Agency received a referral that Mother was selling her food stamps to people in the community, then cancelling them. (N.T. 7/6/21, p. 45). Mother exhibited erratic emotional behavior, vacillating between yelling, crying, and appearing happy. *Id.* Ms. Tweet testified that "[i]t was very hard to figure out what Mother you were going to get when you picked up the phone". (N.T. 7/6/21, p. 46). Mother complained that she did not like Ms. Petersheim and wanted a new caseworker. *Id.* Ms. Tweet testified that Mother's mood vacillation made it difficult for the Agency to determine how to help Mother. (N.T. 7/6/21, pp. 46-47).

The Agency obtained a drug screen upon Mother's release from Dauphin County Prison on October 17, 2017. (N.T. 7/6/21, p. 49).[5] Mother admitted using marijuana and claimed that she was positive for opiates because they had been administered to her by the prison. (N.T. 7/6/21. p.

---

[5] Mother was charged with eight counts of Endangering the Welfare of Children.

49). The Agency's investigation determined that Dauphin County Prison did not administer any medication which would test as an opiate. *Id.* The Agency requested that Mother provide drug screens on October 19 and 20, 2017. Mother refused. *Id.* Mother provided a drug screen on October 25, 2017, which tested positive for marijuana and on October 26, 2017, which tested positive for marijuana and benzodiazepine. (N.T. 7/6/21, p. 50).

On November 6, 2017, the Agency filed a motion for removal of dependent children under Court Ordered Protective Supervision for parents' lack of compliance with the service objectives. [6]

During 2018, the Agency offered the services of Justice Works and Pressley Ridge. (N.T. 11/4/19, p. 7). Mother was hostile and noncompliant. *Id.* Those entities closed the cases with the family for noncompliance and refused to accept additional referrals.

In late 2018, Mother became more compliant and began to address her drug and alcohol issues. (N.T. 11/4/19, p. 8; p. 55). In August 2018, two of Mother's oldest children were returned to her care. (N.T. 11/4/19, pp. 8-9). In March 2019, four of the youngest children, including C.G.F., Jr., were returned to Mother under court ordered protective services. *Id.*

In May 2019, the Agency received information of an allegation that Mother and Father were perpetrators of sexual abuse of a child, not of their own, sex trafficking, and using underage children to provide massages and sexual favors to male adults. (N.T. 11/4/19, p. 10; p. 12; p. 16). That child involved stated in a Children's Resource Center interview that she was raped and required to perform sex acts in Mother's home. (N.T. 11/4/19, pp. 16-17). As of the November 4,

---

[6] C.G.F. Jr.'s placement history is as follows: Agency care and custody from November 6, 2017, to August 16, 2018; Court Ordered protective Services("COPS") while in the physical custody of Mother from March 11, 2019, to May 24, 2019; Agency custody from March 11, 2019, to present. C.G.F., Jr., was placed in a residential treatment facility, Beacon Light Behavioral Health ("Beacon Light") on May 25, 2021. (Motion for Permanency/Dispositional Review, November 16, 2021, para. 14-15).

6

2019, hearing, Mother's internet advertisements for escort services remained posted. (N.T. 11/4/19, p. 11; pp. 14-15). At a May 22, 2019, visit to Mother's residence, Ms. Petersheim observed that Mother's bedroom was arranged as a massage parlor. (N.T. 11/4/19, pp. 12-13). One of Mother's children, who was not dependent, told Ms. Petersheim that she helped Mother prepare for clients at Mother's house by lighting candles and incense. (N.T. 11/4/19, p. 13).

During the three-month review period preceding the November 4, 2019, hearing, Ms. Petersheim and her supervisor met with Mother to explain that Mother was required to undergo an update of her psychological evaluation with Hempfield Behavioral Mental Health. Without an updated psychological examination, the Agency felt it would have no basis on which to request an exception to the Adoption and Safe Families Act ("ASFA"). (N.T. 11/4/19, p. 22). Mother did not cooperate with scheduling and did not undergo an updated psychological examination. *Id.* Mother did not complete programs with Justiceworks, STOPP Services, or Pressley Ridge, an intensive parenting education and family preservation service. (N.T. 11/4/19, pp. 29-30). Ms. Petersheim testified that Mother's home was not appropriate because of the massage parlor and insufficient bedrooms and bedding for the children. (N.T. 11/4/19, p. 34). Mother stopped counseling with T.W. Pontessa in March or April of 2019 and did not return. (N.T. 11/4/19, p. 59). Ms. Petersheim testified that overall, Mother made minimal progress. (N.T. 11/4/19, p. 27).

The children were removed from the home on May 23, 2019. *Id.* As of the November 4, 2019, hearing, the children were in placement fifteen out of twenty-two months. (N.T. 11/4/19, p. 20). At age five, C.G.F., Jr., had been in placement twenty-two months. (N.T. 11/4/19, p. 25). Mother has eleven children, nine of whom were dependent as of the November 4, 2019, hearing. (N.T. 11/4/19, p. 28). The other two children lived with their fathers. *Id.*

7

Licensed psychologist Howard S. Rosen. Ph.D.. conducted two psychological evaluations of Mother. (N.T. 11/4/19, p. 74). Based upon a March 2018 evaluation, Dr. Rosen recommended against reunification services. *Id.* Dr. Rosen conducted a re-evaluation in October 2019. (N.T. 11/4/19, p. 75). He again recommended against reunification services. *Id.* Based upon the 2018 and 2019 evaluations, Dr. Rosen recommended that Mother seek Dialectical Behavior Therapy ("DBT"). (N.T. 11/4/19, p. 76). Mother attended some therapy at T.W. Ponessa. which she did not complete. (N.T. 11/4/19, p. 76). Mother and Father participated in, but did not complete, recommended couples counseling. *Id.* Mother completed several parent training classes. which improved her scores considerably at the 2019 evaluation. *Id.* Dr. Rosen recommended that Mother attend a program to assist with life skills, money management and job coaching. Dr. Rosen had no information that Mother sought such a program. (N.T. 11/4/19, pp. 76-77).

Dr. Rosen testified that upon re-evaluation in 2019, Mother demonstrated elevated scores on two clinical scales of the Minnesota Multiphasic Personality Inventory ("MMPI") as compared to the 2018 evaluation. (N.T.11/4/19, p. 77). Dr. Rosen testified that an individual who demonstrate those scores has significant difficulty interacting personally or socially because they are always argumentative. *Id.* The scores are consistent with one who can control their hostility at times but is also capable of violent outbursts. In addition, the scores are consistent with one who accepts little responsibility for problems. externalizes blame, is suspicious to the point of paranoia, and has a long history of maladjustment such as conflicts in school and landlords and disregard for the law. *Id.* Dr. Rosen opined the pattern demonstrated by Mother generally indicates an antisocial personality which is difficult to change. (*Id.*; N.T. 11/4/19. pp. 84- 85). Dr. Rosen views Mother's strong antisocial attitudes and behaviors as barriers which require DBT therapy in order to for her to reunify with her children. (N.T. 11/4/19. p. 78).

8

Dr. Rosen opined, "So that to me, more than anything, are the barriers that need attention if there is any hope of [Mother] reunifying with her children and DBT therapy would be the mechanism and we have gone now eighteen months and that is not completed." *Id.*

Dr. Rosen recommended that Mother obtain a psychiatric evaluation and intensive outpatient therapy and participate in medication management for her personality disorder. (N.T. 11/4/19, p. 85). Dr. Rosen testified that the medication assisted treatment for alternatives to illegal drugs with a counseling component such as offered by Discovery House would meet his recommendations. (N.T. 11/4/19, p. 86).

Dr. Rosen evaluated C.G.F., Jr. (N.T. 11/4/19, p. 79). Dr. Rosen opined that C.G.F. Jr., was adjusting poorly in school, in his foster home and the community. (N.T. 11/4/19, p. 78). Dr. Rosen found that C.G.F., Jr., believes that other children are smarter than he and that he cannot learn. (N.T. 11/4/19, p. 79). C.G.F., Jr., has clear patterns of inattention, lack of concentration an impulsive nature, aggression, and impulsivity. (N.T. 11/4/19, pp. 79-80). Dr. Rosen recommended Intermediate Unit placement for C.G.F., Jr. in a small educational setting as well as medication. (N.T. 11/4/19, p. 78). Dr. Rosen also recommended a program for young children which would help with emotional and behavioral regulation. (N.T. 11/4/19, pp. 80-81).

Dr. Rosen observed that C.G.F., Jr., appeared comfortable with Mother and did not want her to leave the room. (N.T. 11/4/19, p. 83). Dr. Rosen noted, however, that Mother had a history of not sending the children to school, frequently moving residences, and medical neglect. (N.T. 11/4/19, p. 84). Dr. Rosen opined that the bonding may be a factor creating risk to the children. (N.T. 11/4/19, p. 84).

At the conclusion of the November 4, 2019, Permanency Review /Goal Change Hearing, we reluctantly ordered the goal as to C.G.F., Jr. remain return to parent or guardian (N.T. 11/4/19,

pp. 93-94). We expressed grave concern as to a realistic prospect of reunification based upon the delays in progress. *Id.* We found that the Agency satisfied the requirements of Family Finding and directed that they continue to do so. We found that C.G.F., Jr. was safe in his current placement setting and that the Agency had taken sufficient steps to ensure that the caregiver exercised the reasonable prudent parent standard. (N.T. 11/4/19, p. 90). We granted an exception to the Adoption and Safe Family Act timeframe. *Id.* We further ordered that the Agency inquire into a trauma focused program for C.G.F., Jr. *Id.*

The Agency filed a Petition for Involuntary Termination of Parental Rights on May 7, 2021. We conducted the first of four hearings on July 6, 2021. Mother's counsel called as a witness Barbara Murphy. Ms. Murphy is a supervisor and certified alcohol counselor at Discovery House, in Harrisburg. (N.T. 7/6/21, p. 7; p. 19). Ms. Murphy met Mother in approximately early 2020. *Id.* Mother came to Discovery House for management of a substance use disorder. *Id.* Mother stated to Ms. Murphy that she used heroin prior to coming to Discovery House but had stopped using it. *Id.* Ms. Murphy stated that Mother tested negative in random tests during the 18 months she came to Discovery House. (N.T. 7/6/21, p. 8). During the initial two and one half-hour assessment, Mother stated that she came to Discovery House to become a better parent and to work on return of her children. (N.T. 7/6/21, p. 10). Mother typically met with Ms. Murphy one hour per week. *Id.*

Ms. Murphy testified that Mother receives substance support from Discovery House in the form of a daily dosage of methadone. (N.T. 7/6/21, p. 11). Mother began taking a daily dose of 120 milligrams and has cut that dosage by half. (N.T. 7/6/21, p. 12). Ms. Murphy had no information regarding Mother's prior drug use other than Mother's report that she had been clean for several months. (N.T. 7/6/21, p. 23).

10

Ms. Murphy's counseling of Mother involved discussing Mother's frame of mind, her desire to be a mother, how to move forward, coping skills and relapse prevention. (N.T. 7/6/21, pp. 13-14). Mother participated in 40 one-half hour group sessions regarding coping mechanism skills and prevention skills. (N.T. 7/6/21, p. 17). Mother attended one-on-one individual therapy once per month for 18 months. (N.T. 7/6/21, p. 18). Mother expressed remorse over what has occurred in the past. (N.T. 7/6/21, p. 14). Ms. Murphy believes Mother is willing to continue to work on recovery. (N.T. 7/6/21, p. 16). Ms. Murphy testified that Mother also receives psychological services from an entity called Baby Love. (N.T. 7/6/21, p. 21).

Mother did not provide Discovery House with the two psychological evaluations performed by Dr. Rosen. (N.T. 7/6/21, p. 25). Mother stated to Discovery House that her diagnoses were mental issues related to sadness and remorse. (N.T. 7/6/21, pp. 26-27). Mother did not provide Discovery House with records of the mental health provider, T.W. Ponessa. (N.T. 7/6/21, p. 29).

At the September 7, 2021, continuation of the hearing on the Petition for Termination of Parental Rights, Mother's counsel called Kimberly Brown as a witness. Ms. Brown testified that Mother began a nine-month cosmetology school program in October 2020. (N.T. 9/7/21, p. 18). Ms. Brown testifies that it was necessary for her to constantly call and leave messages for Mother to encourage her to attend the mandatory minimum of classes. (N.T. 9/7/21, p. 19). When asked if Mother acted appropriately in class, Ms. Brown responded "She's had her ups and downs". (N.T. 9/7/21, p. 14). Mother stopped the program after six months because she was expected to fail for lack of attendance. (N.T. 9/7/21, pp. 19-20).

Mother's counsel called Kenneth Sutton as a witness. Mr. Sutton testified that he is a mental therapist and addiction counselor. (N.T. 9/7/21. pp. 47-48). Mr. Sutton testified that he obtained his Ph.D. in clinical counseling through an on-line program. (N.T. 9/7/21, p. 49). Mr. Sutton's

11

business letterhead did not reflect that he possesses a Ph.D. (N.T. 9/7/21, pp. 54-55). Mr. Sutton is not a licensed psychologist. (N.T. 9/7/21, p. 58). Because he is not a licensed psychologist, Mr. Sutton did not administer the MMPI. (N.T. 9/7/21, p. 59). Mr. Sutton met with Mother thirty times from October 2020 to April 2021 for anger management and depression. (N.T. 9/7/21, p. 48; p. 55). Mr. Sutton testified that he utilized a combination of DBT and cognitive behavior therapy ("CBT"). Mr. Sutton could not recall where he obtained certification for CBT nor the details of his training. (N.T. 9/7/21, p. 56). Mr. Sutton testified that the focus of his therapy was trauma. (N.T. 9/7/21, p. 52). Mother and Father attended approximately five sessions of couples' therapy. (N.T. 9/7/21, p. 57). During Mother's therapy sessions, Mr. Sutton taught Mother mindfulness skills and breathing exercises and had Mother retell stories related to her past trauma. *Id.* Mr. Sutton testified that he provided the Agency with a letter dated April 12, 2021, which states that Mother completed DBT therapy. (N.T. 9/7/21, p. 53). Mr. Sutton testified that he had no recommendation as to how long Mother would need therapy as he viewed that decision as one belonging to Mother. (N.T. 9/7/21, p. 54).

At the September 7, 2021, continuation of the hearing on termination of parental rights, the Agency recalled Dr. Rosen. Dr. Rosen noted that Mother improved between the 2018 and 2019 in scores which measure parenting attitudes. (N.T. 9/7/21 p. 64). However, Dr. Rosen concluded that very few other improvements occurred. *Id.* Mother's evaluations in 2018 and 2019 were nearly identical in measures of deceptiveness, manipulation anger, resentment and difficulty interacting personally or socially due to argumentativeness. *Id.* Dr. Rosen opined that such measures indicate the capability for violent outbursts, externalization of blame, suspicion, social maladjustment, and unlikelihood of responding positively to psychological therapies. *Id.* Persons

12

with scorers such as Mother's have significant disregard for social rules and are likely to exhibit antisocial attitudes and behaviors. (N.T. 9/7/21 p. 65).

When Dr. Rosen saw Mother in October 2019, she had not taken the recommended DBT therapy. *Id*. Dr. Rosen testified that he is aware of only two programs in the region, the Hershey Medical Center location on Front Street in Harrisburg and Merakey on Cameron Street, both of which offer DBT therapy by a credentialed therapist. *Id*. Dr. Rosen opined that the counseling Mother received did not meet the criteria of DBT nor his recommendation to Mother. (N.T. 9/7/21 pp. 67-70). Dr. Rosen expressed concern regarding Mother's use of a medical marijuana card and methadone treatment based upon her history of dependence. *Id*.

At the September 7, 2021, hearing, the Agency also recalled caseworker Kaylie Petersheim, who worked with Mother since 2017. (N.T. 9/7/21, p. 85). Since the court deemed C.G.F., Jr., dependent in November 2017, problems arose in addition to the initial reasons for placement. (N.T. 9/7/21, p. 86). Ms. Petersheim testified that it was necessary to remove C.G.F. Jr., from a foster home placement based upon inappropriate physical discipline although Mother suggested G.F.Jr's placement in that home. *Id*. Mother responded by becoming hostile with the caseworker. *Id*. Mother has brought marijuana to the Agency and smelled strongly of marijuana. (N.T. 9/7/21, pp. 86-87). Mother has appeared at the Agency wearing animal costumes or scandalous attire. (N.T. 9/7/21, p. 87; p. 92). On May 18, 2018, Mother stated that she hated Ms. Petersheim and that if she had a gun she would kill her. *Id*.

Ms. Petersheim further testified that Mother has not consistently maintained employment or a career path. *Id*. Mother has not documented a legal source of income. (N.T. 9/7/21, p. 11). Mother has remained in the same home since February 2019. (N.T. 9/7/21, p. 112). Although the home is structurally free of safety concerns, concerns remain as to the activities in the home. (*Id*.:

13

p. 115). In March or April of 2021, Mother admitted in the past of having abused her medical marijuana card and using marijuana provided by her brother. (N.T. 9/7/21 p. 88; 118). In May 2019, the Agency became concerned that Mother was operating a sex business out of her home. *Id.* Mother continued to post advertisements for massage services for five months after the children were removed. (N.T. 9/7/21, p. 88; pp. 90-92).

Ms. Petersheim testified that the Agency made a referral to law enforcement for allegations of sex trafficking. (N.T. 9/7/21 p. 89). However, the Agency learned that no criminal charges were filed in that the child victim was hospitalized and law enforcement sought to minimize further trauma to the child. *Id.* The Agency deemed Mother "indicated" as a sex trafficker. (N.T. 9/7/21, pp. 112-113). Mother appealed. The Agency did not pursue a Bureau of Hearings and Appeals review, again, to avoid further traumatization of the child victim. (N.T. 9/7/21 p. 113; p. 137; p. 152). Therefore, Mother is no longer indicated as a perpetrator of abuse. (N.T. 9/7/21, p. 153).

In July 2021, the Agency received a referral that Mother left a non-dependent child at home alone during which time a neighbor was stabbed. (N.T. 9/7/21 p. 116).

Ms. Petersheim testified that Mother's volatile behavior and disturbingly violent and personal verbal attacks in text messages made her very, very uncomfortable. Mother's conduct necessitated Ms. Petersheim meeting with the Agency's Human Resources Department. (N.T. 9/7/21, pp. 107-110).

Ms. Petersheim received no documentation from Mr. Sutton that Mother completed an anger management or any counseling program until receipt of his April 2021. (N.T. 9/7/21, pp. 118-119; p 154). Mother refused to sign releases and revoked releases which would allow providers to send reports regarding Mother to the Agency. (N.T. 9/7/21, p. 125).

14

Ms. Petersheim testified that the Agency has assisted the family as follows: provided multiple referrals to Pressly Ridge and Justiceworks; conducted bi-weekly meetings to review goals; reviewed the family service plan; reviewed psychological evaluations; met with Mother's counsel to review goals and service objectives; sent Fostering Connections letters to seek family supports and resources; made referral to It Takes a Village to conduct extensive family finding; purchased bus passes; made referrals to Samara for parenting education; made two referrals for psychological examination of Mother. (N.T. 9/7/21, pp. 121-122).

Ms. Petersheim testified that because Mother was frequently unreachable or unwilling to cooperate, it was necessary for the Agency to obtain a court order for authorization for hospital admissions and medication changes for C.G.F., Jr. (N.T. 9/7/21, pp. 123-124).

Ms. Petersheim testified that the Agency sought termination of Mother's rights based upon the following: Mother's compliance has fluctuated between substantial and minimal; Mother's failure to significantly or consistently address mental health concerns; failure to timely complete family service objectives; the children's placement in care for a period far longer than permitted by the Adoption and Safe Families Act; Mother 's failure to complete intensive reunification services. (N.T. 9/7/21, pp. 120-121; p. 125; p. 146). Ms. Petersheim testified that, based upon Mother's threating text messages sent as recently as 2020, she did not believe that Mother has made progress toward maintaining appropriate behavior. (N.T. 9/7/21 p. 147). Mother's behaviors fluctuated from stable and appropriate to volatile and hostile. (N.T. 9/7/21 p. 148).

Mother has currently resolved all outstanding criminal matters. (N.T. 9/7/21 p. 135). Mother has not provided documentation of enrollment in school. *Id.* Mother has working utilities. (N.T. 9/7/21, p. 139). Mother provided drug screens throughout 2020 and most of 2021, which tested positive for marijuana and methadone. *Id.*

15

Ms. Petersheim concluded that after more than forty-five months, Mother has not fully remedied those conditions for which the children were brough into care. (N.T. 9/7/21, p.125; pp. 157-158). Ms. Petersheim testified that Mother has not consistently placed C.G.F., Jr.'s needs before her own. *Id.* For example, in late 2020 or early 2021, Mother chose to participate in a nail art competition rather than attending a treatment plan meeting for C.G.F., Jr. *Id.* Staff at Beacon Light have expressed concern that Mother makes promises to C.G.F., Jr. regarding permanency. (N.T. 9/7/21, p. 131).

Ms. Petersheim testified that currently, no pre-adoptive resource exists for C.G.F., Jr. (N.T. 9/7/21, p. 129). Although no pre-adoptive resource exists, the Agency seeks permanency for C.G.F., Jr. which will ensure his safety and the opportunity to reach his full potential. (N.T. 9/7/21, p. 130). Caregivers of C.G.F., Jr.'s siblings are willing to maintain sibling contact. (N.T. 9/7/21, pp. 160-161). The Agency intends to pursue adoption resources for C.G.F., Jr. as soon as he is released from Beacon Light. (N.T. 9/7/21, p. 132).

Counsel for Mother filed a Motion for Goal Change on November 30, 2021. We conducted a permanency review hearing on December 2, 2021. At that time, C.G.F., Jr. was receiving psychiatric treatment at his current placement, Beacon Light. Ms. Petersheim testified that C.G.F., Jr.'s therapist, Eric Humble, communicates with Mother at least one time per week. (N.T. 12/2/2021, p. 32). Ms. Petersheim and her supervisor met with Mother on December 1, 2021, to review the importance of Mother's attendance at all meetings with Beacon Light as well as Mother maintaining availability for necessary contact. *Id.* Mother missed many team meetings regarding C.G.F., Jr.'s medical, educational, and treatment goals, which included Beacon Light providers, Agency attorneys, guardians *ad litem*, and Court Appointed Special Advocate representatives. (N.T. 12/2/2021, p. 33). Mother attended a meeting on August19, 2021, but

missed the next two. *Id.* Mother arrived twenty minutes late for a reauthorization meeting which required Mother's attendance in order for C.G.F., Jr. to remain at Beacon Light. *Id.*

At the February 16, 2022, hearing on termination of parental rights, Mother's counsel presented the testimony of clinical psychologist Hugh Smith, Ph.D. Dr. Smith conducted a psychological evaluation and parenting assessment of Mother on January 6, 2022. (N.T. 2/16/22, p. 12). In advance of the telehealth evaluation of Mother, Dr. Smith reviewed the Agency's request for psychological evaluation of Mother, the dependency petition, the pre-dispositional statement, and two previous psychological evaluations completed by Hempfield Behavioral Health. (N.T. 2/16/22, p. 13). In addition, Dr. Smith spoke with Agency caseworkers Ms. Petersheim and Aesha Williams to discuss the background of the case, their observations, and the reason for the referral. *Id.*

Dr. Smith testified that he administered the Adult Adolescent Parenting Inventory which identifies risk factors for parenting. (N.T. 2/16/22, p. 14). As to the risk factor related to expectations of children. Dr. Smith concluded that Mother presented a moderate risk. (N.T. 2/16/22, p. 14). Mother presented a medium to low risk as to the factor of parental empathy, that is, understanding of children being permitted to display normal developmental behaviors. (N.T. 2/16/22, pp. 14-15). Mother presented low risk of use of corporal punishment, parent-family roles and children's power and independence. (N.T. 2/16/22, p. 15). In comparing Mother's prior evaluations, Dr. Smith found improvement in Mother's parenting skills. (N.T. 2/16/22, p. 15). Dr. Smith identified no specific area of stress on the parenting stress index which measures stress associated with a child's characteristics in relation to the parent's characteristics. (N.T. 2/16/22, pp 17-18).

17

Dr. Smith testified that Mother did not disclose to him information regarding C.G.F., Jr's. developmental delays. (N.T. 2/16/22, p.18-19). Dr. Smith testified that he would be concerned about Mother's ability to care for C.G.F., Jr. if, rather than Mother simply haven chosen not to disclose information regarding C.G.F. Jr., Mother lacked recognition of C.G.F. Jr.'s mental health issues. (N.T. 2/16/22, p. 19). Dr. Smith opined that he would expect that a parent with insight into a child's mental health issues would discuss the challenges in managing the child's behavior and be actively involved in the child's treatment team. (N.T. 2/16/22, pp. 19-20).

Dr. Smith conducted a psychological and mental health evaluation of Mother. Dr. Smith found indications of trauma, mood disturbance, substance use and personality traits which indicate a need for treatment. (N.T. 2/16/22, p. 21). Dr. Smith opined that, if left untreated, those indicated findings may interfere with Mother's ability to care for a child. (N.T. 2/16/22, p. 21).

Mother related to Dr. Smith that she had received DBT through Pennsylvania Psychiatric Institute. *Id.* Mother also reported that she was participating parenting classes. *Id.*

Dr. Smith testified that the results of Mother's clinical evaluations indicate a tendency to minimize negativity and maximize positive traits. (N.T. 2/16/22, p. 22). Mother's results were in the high range of the scale on desirability and the low average end for debasement, that is, a pattern of a low level of disclosure. (N.T. 2/16/22, p. 23; p. 37). Dr. Smith characterized the desirability scale as high, although not invalid. *Id.* Dr. Smith found Mother to be forthcoming in describing symptoms and interventions. (N.T. 2/16/22, p. 24). Dr. Smith testified that the DBT and drug alcohol treatment Mother receives aligns with what he would recommend. *Id.*

Dr. Smith recommended that Mother undergo psychiatric consultation for mood disturbances, which he diagnosed as a trauma and stress related disorder, and as unspecified bipolar and related disorder. (N.T. 2/16/22, pp. 26-27; p.53). Dr. Smith opined that a psychiatric evaluation

18

would determine whether, and what type of, medication would address Mother's mood disorder. (N.T. 2/16/22, p. 35). Dr. Smith opined that without a psychiatric evaluation. he viewed as higher than moderate the risk of a child being placed in Mother's care. (N.T. 2/16/22. pp. 27-28).

Dr. Smith recommended that Mother seek vocational rehabilitation. (N.T. 2/16/22. pp. 26-27). Dr. Smith noted that Mother has a history of brief work experiences and that an earlier psychological evaluation referred to a school program. (N.T. 2/16/22, p. 38). At the time of Dr. Smith's evaluation, Mother was in a school program which she had not completed. *Id.* Dr. Smith found that Mother required additional support to determine her needs related to securing stable employment. (N.T. 2/16/22. p. 39).

Dr. Smith opined that Mother has made progress and gained insights since the 2018 and 2019 evaluations, and seemed willing to undergo psychiatric assessment and recommended treatment. (N.T. 2/16/22, p. 28). However. Dr. Smith refrained from stating that Mother was prepared to be a safe and loving parent. (N.T. 2/16/22. p. 30: p.53). Rather, Dr. Smith stated that although Mother is "on the path". it would be necessary for him to see that Mother undergo a psychiatric evaluation, psychiatric care. and monitoring. *Id.* Dr. Smith testified that Mother has historically failed to follow through with the recommendations of the psychological evaluations. (N.T. 2/16/22, p. 40). Dr. Smith testified that he could not state what amount of time of Mother's adherence to a medication treatment regime would be required in order for him to feel comfortable recommending that C.G.F.. Jr. be returned to Mother. (N.T. 2/16/22. p. 53).

In questioning Dr. Smith on cross examination. Father, acting *pro se*, presented a document dated February 14, 2020. which reflected Mother's discharge from Merakey Behavioral Health Outpatient Clinic for not presenting to the clinic in more than 120 days and failing to respond to mail correspondence or voicemail. (N.T. 2/16/22, p. 43). In addition. Father presented a paper

19

dated February of 2022, from Pennsylvania Psychiatric Institute indicating Mother's enrollment in an intensive outpatient DBT program beginning January 17, 2022, and concluding on April 14, 2022, as well the scheduling of a psychiatric evaluation for February 23, 2022. (N.T. 2/16/22, p. 43).

Dr. Smith acknowledged that in 2018 and 2019, Mother received recommendations to undergo DBT, but, as of her appointment with him on January 6, 2022, she was, according to her statement, in a pre-DBT program. (N.T. 2/16/22, pp. 32-33). Dr. Smith found it concerning that three years elapsed, and Mother had not undergone the recommended psychiatric evaluation. (N.T. 2/16/22, pp. 33-35). Dr. Smith also opined that it would also be concerning if Mother did not consistently attend treatment team meetings for C.G.F., Jr., in view of C.G.F., Jr.'s mental health and developmental needs. (N.T. 2/16/22, p. 36).

Dr. Smith did not recommend that C.G.F., Jr. be returned to Mother. (N.T. 2/16/22, p. 37; p.53).

Zachary Ransom, the residential treatment coordinator at Beacon Life testified. Mr. Ransom testified that he has served as C.G.F., Jr.'s individual therapist and family therapist for three weeks prior to the February 16, 2022, hearing. (N.T. 2/16/22 pp. 60-61; p.71). Mr. Ransom testified that meets one hour per week with Mother and C.G.F., Jr. during which he works with Mother on ways to better interact, support, and communicate with C.G.F., Jr. (N.T. 2/16/22, p. 61). Mr. Ransom described Mother's participation as energetic engaged, open, and receptive to feedback. (N.T. 2/16/22, p. 61). Mr. Ransom testified that Mother needs very little feedback in engaging with C.G.F., Jr. in a healthy manner. (N.T. 2/16/22, p. 62). Team meetings occur every other week, which Mother regularly misses. (N.T. 2/16/22, p. 63). Mr. Ransom described C.G.F., Jr.'s reaction to Mother as playful and enjoying seeing her. (N.T. 2/16/22, p. 64).

20

Mr. Ransom testified that no discharge plan currently exists for C.G.F., Jr. (N.T. 2/16/22, p. 65). Any discharge plan would require several months of safety planning to ensure that all parties are prepared in the event of a crisis or elevated needs of the child. (N.T. 2/16/22, p.66). Mr. Ransom stated that C.G.F., Jr. will require long-term support, likely, individual therapy on and off for the rest of his life and potentially, family therapy, as well as the availability of services and crisis intervention. (N.T. 2/16/22, pp. 66-67).

Mr. Ransom testified that Mother's history and the possibility of relapse raise concern regarding C.G.F., Jr.'s returning home. (N.T. 2/16/22, p. 67). If Mother were identified as a discharge resource, the safety plan would require that she continue to receive treatment and that a contingency plan exist should Mother relapse. (N.T. 2/16/22. p. 68). Mr. Ransom could not provide a timeframe within which he would feel comfortable with discharging C.G.F., Jr. (N.T. 2/16/22, p. 70). Mr. Ransom testified that if C.G.F., Jr. were discharged to Mother, "... [we would ] have some serious work to do on it, we're looking like months, and engaging and preparing and planning for safety." *Id.*

Mr. Ransom testified that at the Agency's request, he discussed with C.G.F., Jr. the option of foster care. (N.T. 2/16/22. p. 69). C.G.F., Jr. stated that he wished to go home to Mother. C.G.F., Jr. exhibited a typically child-like response to the inquiry, with added difficulty in comprehension because of the trauma he has experienced. *Id.* Mr. Ransom testified that he is aware that C.G.F., Jr. was exposed to alleged sexual abuse, physical abuse, and neglect. (N.T. 2/16/22, p.79).

Eric Humble, a residential master therapist at Beacon Life testified. Mr. Humble has conducted individual, family, and group therapy with C.G.F., Jr. since his admission. (N.T. 2/16/22, pp. 84-85). When C.G.F., Jr. first arrived, treatment was directed to C.G.F. Jr.'s most

21

dire needs: reducing aggression, compliance, and meeting safety and security needs. (N.T. 2/16/22, p. 86). Mr. Humble testified that Mother has been actively involved in the family therapy. (N.T. 2/16/22, pp. 87-88). Mother has demonstrated an understanding of C.G.F., Jr.'s diagnoses and developmental needs. (N.T. 2/16/22, p. 90). Mr. Humble testified that when Mother misses a meeting, she contacts him to discuss information regarding the meeting. (N.T. 2/16/22. p. 91). Mr. Humble believes that C.G.F., Jr. and Mother demonstrate love for each other. *Id.* Mr. Humble did not conduct a bonding assessment. (N.T. 2/16/22, p. 93).

Kelli Jones. C.G.F.. Jr.'s foster parent from February 2020 to September 2020 testified. Ms. Jones testified that she observed a loving relationship between Mother and C.G.F., Jr. (N.T. 3/31/2022, pp. 4-6; pp. 12-13). Ms. Jones and Mother are friends. Ms. Jones provides foster care to another of Mother's children. (N.T. 3/31/2022, p. 16). Ms. Jones testified that C.G.F., Jr.'s developmental issues caused difficulties in school but not in the home. (N.T. 3/31/2022, p. 6). Ms. Jones testified that C.G.F. Jr.'s biggest issue in the home was hoarding food. (N.T. 3/31/2022, p. 7; p. 15). Ms. Jones and Mother spoke with C.G.F., Jr. together to address his behavior at school. (N.T. 3/31/2022, p. 9). Mother participated with Ms. Jones regarding educational decisions, school shopping and C.G.F., Jr.'s birthday party. (N.T. 3/31/2022, p. 10). Ms. Jones never saw Mother under the influence of any substances or exhibit inappropriate behavior or discipline. (N.T. 3/31/2022, p. 11).

Mother testified that C.G.F., Jr. is her youngest son. (N.T. 3/31/2022, p. 20). Mother has visited C.G.F., Jr. virtually and in person during his residence at Beacon Light. (N.T. 3/31/2022, pp. 21-22). Mother visited C.G.F., Jr., accompanied by a Beacon Light counselor, for his birthday and took him shopping and out to eat. (N.T. 3/31/2022, p. 24). Mother testified that she spoke to C.G.F.. Jr. about his progress at Beacon Light and encouraged positive behavior. (N.T.

22

3/31/2022, pp. 23-25). Mother testified that she has participated in family therapy virtually one time per week for the past year. (N.T. 3/31/2022, p. 25). Mother stated that the goals of the therapy are to assist in the development of the relationship between Mother and C.G.F., Jr. and to work on techniques to enable Mother to remain focused and express emotions appropriately. (N.T. 3/31/2022, pp. 25-26). Mother stated that the sessions also teach her to anticipate C.G.F., Jr.'s responses and deescalate C.G.F., Jr.'s behaviors. (N.T. 3/31/2022, p. 26). Mother feels that the family therapy sessions have been helpful to her and to C.G.F., Jr. (N.T. 3/31/2022, p. 27). Mother speaks to C.G.F., Jr. on the phone every day or every other day. (N.T. 3/31/2022, p. 29). C.G.F., Jr. tells her that he loves her and calls her mommy. (N.T. 3/31/2022, p. 29). C.G.F., Jr.'s counselors have discouraged Mother from discussing the topic of discharge. (N.T. 3/31/2022, pp. 29-30).

Mother testified that C.G.F., Jr. was first removed from her care in 2017. (N.T. 3/31/2022, p. 31). Mother acknowledged that at that time, she was a bad mother, a person she would describe as "a monster". *Id.* Mother stated that she abused drugs and went to rehab three times but each time, resumed using drugs. (N.T. 3/31/2022, p. 32). Mother testified that she became sober after 2018, after her nephew died of an overdose. (N.T. 3/31/2022, p.33).

Mother stated, at the time of the hearing, that she attends a methadone program at Discovery House. (N.T. 3/31/2022, p. 34). Mother stated that initially, she abused the program by increasing use from 30 milligrams to 120 milligrams. *Id.* She now uses 26 milligrams and hopes to be off methadone by the end of the year. (N.T. 3/31/2022, p. 34). Mother has a medical marijuana card which she states she has abused. (N.T. 3/31/2022, p. 35). Mother testified that she is trying to reduce her use of medical marijuana. *Id.*

23

Mother testified that she has lived at the same three-bedroom house for three years and has not been evicted or had utilities stopped. (N.T. 3/31/2022, pp. 34-35). Mother testified that she works as a caretaker, for which she does not receive a paycheck. (N.T. 3/31/2022, p. 36). Mother testified that she is on a leave of absence from hair, makeup and massage school and intends to return in thirty days from the date of the hearing. (N.T. 3/31/2022, p. 37).

Mother testified that she began DBT counseling at Pennsylvania Psychiatric Institute approximately one or two months before the hearing. (N.T. 3/31/2022, p. 38). Mother testified that through that counseling she has learned to identify behaviors, such as anger management, and addresses them differently than she has in the past. (N.T. 3/31/2022, p. 38; p. 43).

Mother testified that she wants C.G.F., Jr. returned to her and believes that she can be a good mother. (N.T. 3/31/2022, p. 50).

## DISCUSSION

### A. The Agency met its burden of proving that statutory grounds exist for termination of Mother's parental rights.

The standard of review governing the trial court's termination of parental rights is well settled. Namely,

> When reviewing an appeal from a decree terminating parental rights, [the Superior Court] is limited to determining whether the decision of the trial court is supported by competent evidence. *See In re K.C.W.*, 456 Pa. Super.1, 689 A.2d 294, 298 (1997). Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. *Id.* Where a trial court has granted a petition to involuntarily terminate parental rights, [the Superior Court] must accord the hearing judge's decision the same weight we would give to a jury verdict. *See In re Child M.*, 452 Pa. Super. 230, 681 A.2d 793, 800 (1996). We must employ a broad comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence. *See In re Matsock*, 416 Pa.Super. 520, 611

24

A.2d 737, 742 (1992). *In re C. S.* 761 A.2d 1197, 1199 (Pa. Super. 2000).

The Agency, as the party seeking termination, bears the burden of establishing, by clear and convincing evidence that grounds exist for termination of parental rights. *In re J.D.W.M.,* 810 A.2d 688, 690 (Pa. Super. 2002). The standard of clear and convincing evidence means "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Matter of Sylvester,* 555 A.2d 1202, 1203-1204 (Pa. 1989). The Agency met its burden of proving that termination of Mother's parental rights was proper.

The record establishes by clear and convincing evidence that for an unreasonable time, Mother failed to remedy the conditions which led to placement although services and opportunities to do so were made readily available to enable her to do so. The Agency sought termination of Mother's parental rights based upon the Adoption Act, 23 Pa.C.S. §2511(a)(1), (2), (5) and (8), which provide:

(1)   The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)   The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5)   The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the

25

removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time. the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa. Stat. and Cons. Stat. Ann. § 2511

In considering whether the party seeking termination has satisfied these provisions, the Appellate Court keeps in mind that a parent has an affirmative duty to work towards the return of his or her children. *In re Adoption of J.J.*, 511 Pa. 590, 602, 515 A.2d 883, 889 (Pa. Super. 1986). At a minimum, that "affirmative duty requires that the parent show a willingness to cooperate with CYS to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligations inherent in parenthood." *Id.* In a termination proceeding, the trial court must consider all the circumstances in determining whether a parent has fulfilled his obligations; the court must further measure the parent's performance in light of what would be expected of any individual under similar circumstances. *Matter of M.L.W.*, 307 Pa. 29, 33-34, 452 A.2d 1021, 1023-24 (1982) *(citations omitted)*. Further, the Appellate Court need only agree with the trial court's decision as to any one subsection in order to affirm the termination of parental rights. *In re J.E.* 745 A.2d 1250 (Pa. Super. 2000). *See also, In re J.I.R.*, 808 A.2d 934, 940 n.6 (Pa. Super. 2002). The Superior Court has explained:

> The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care

that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have her parental rights terminated. There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

\*\*\*

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

As detailed herein, clear and convincing evidence established grounds for termination under 23 Pa.C.S.A. §§ (a)(1), (2), (5) and (8). We find that for an unreasonable period of time, Mother left C.G.F., Jr. without essential parental care or control. We find that Mother will not, or cannot, remedy her incapacity. Mother failed to consistently address her mental health concerns, the primary impediment to her ability to safely parent C.G.F., Jr. Mother has never undergone the psychiatric evaluation, recommended as early as 2018, which would enable her to seek medication for significant, concerning personality traits.

The testimony evidences Mother's inability to maintain focus upon and reach an objectives, even where accomplishment of the objective would allow for return of C.G.F., Jr. to her care.

We reach this conclusion although Mother's testimony at the March 31, 2022, hearing is articulate, sympathetic, and, at times, persuasive. Mother appears to present herself in a most positive light, a trait documented in her psychological evaluation. We commend Mother for

27

acknowledgment of the type of person she was in the past. However, we have observed Mother and heard testimony regarding her conduct in hearings spanning three years. We heard testimony regarding her volatile, unpredictable conduct and inconsistent progress. Mother's presentation does not alter the hard facts: Mother failed to utilize the resources extended to her to enable her to preserve her relationship with C.G.F., Jr., and resist obstacles for an unreasonable time, to the detriment of C.G.F. Jr.. Mother admitted that she misused methadone treatment for an extended period to further her substance abuse, thereby placing her own objectives before her parental duty to C.G.F. Jr.. Mother failed to obtain a source of legal employment or complete the schooling she began. Since 2017, Mother expended great effort opposing the Agency's efforts to support her, rather than expending that energy to utilize resources extended to her to enable her to reunify with her child. Because Mother's progress vacillated, we allowed more than ample time for her to continue her efforts. However, much of the progress to which Mother testified on March 31, 2022, she made only after the filing of the Petition for Termination of Parental Rights.

We rely heavily upon the testimony of Dr. Smith. Dr. Smith also acknowledged Mother's progress. Yet, he remained unwilling to state that C.G.F., Jr. could be safely released to Mother's care. Dr. Smith found it significant that Mother did not acknowledge awareness of C.G.F., Jr.'s special needs.

In addition, Mr. Ransom, C.G.F., Jr.'s therapist at Beacon light expressed concern about the return of C.G.F., Jr. to Mother's care based upon the possibility of her relapse.

We reach this conclusion guided by the principle that "[p]arental rights are not preserved by waiting for a more suitable time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008). Even with the progress made, grave concerns remain as to whether Mother can

sustain behaviors necessary to safely parent C.G.F., Jr.. We find that the Agency has met its

burden of proving by clear and convincing evidence that grounds exist for termination of

parental rights.

### C. Best Interests Analysis

We also find that termination of Mother's parental rights serve C.G.F., Jr.'s best interest.

Pursuant to Section 2511(b), a court must give 'primary consideration to the [developmental,

physical and emotional] needs and welfare of the child." *In re J. E.*, 745 A.2d 1250, 1254-55 (Pa.

Super. 2000) (*citations omitted.*) The statute provides,

> Other considerations. - The court in terminating the rights of
> a parent shall give primary consideration to the
> developmental, physical and emotional needs and welfare of
> the child. The rights of a parent shall not be terminated solely
> on the basis of environmental factors such as inadequate
> housing, furnishings, income, clothing and medical care if
> found to be beyond the control of the parent. With respect to
> any petition filed pursuant to subsection (a)(1),(6), or (8), the
> court shall not consider any efforts by the parent to remedy
> the condition described therein which are first initiated
> subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

In addition, the Superior Court has stated that while "Section 2511(b) does not explicitly

require a bonding analysis, [case law provides that] analysis of the emotional bond, if any, between

a parent and a child is a factor to be considered in determining the developmental, physical and

emotional needs and welfare of the child under §2511(b)." *In the Matter of K.K.R.-S., K.M.R.,

K.A.R.*, 958 A.2d 529, 533 (Pa. Super. 2008). The Superior Court has explained,

> Intangibles such as love, comfort, security, and stability are
> involved when inquiring about the needs and welfare of the
> child. The court must also discern the nature and status of the

> parent child bond, paying close attention to the effect of
> permanently severing the bond.

*In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006).

Our Superior Court has reminded that,

> With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa. Super. 2018) (citation omitted). Moreover, the fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted). Rather, the orphans' court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary and beneficial relationship. *Id.* at 898.
>
> In addition to evaluating whether the child's bond to the parent is meaningful, the orphans' court can "equally emphasize the **safety** needs of the child, particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs." *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008) (emphasis in original).
>
> Finally, Section 2511(b) provides, "the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S. § 2511(b).

*In re Adoption of K.M.G.*, 2019 PA Super 281, 219 A.3d 662, 674–75 (2019), aff'd, 240 A.3d 1218 (Pa. 2020)(emphasis in original).

As explained in *In re Adoption of K.M.G.*, *supra*, in evaluating the child's bond to the parent, we must look to his safety need, especially where, as here, special needs exist. In addition, although we do not make our finding as to C.G.F. Jr.'s best interests solely upon environmental factors, we find it relevant to the bonding analysis that Mother has, by decisions within her control, failed to demonstrate the ability to meet C.G.F., Jr.'s safety and security needs by earning documented income. We find that Mother failed to demonstrate consistent participation

in C.G.F., Jr.'s care plan at Beacon Light. C.G.F., Jr.'s providers testified that consideration of C.G.F., Jr.'s discharge is premature. We find that Mother is unable to meet C.G.F. Jr.'s significant educational, behavioral, and mental health needs which necessitated his admission to Beacon Light and which needs remain.

As to the existence of a bond which, if broken, would be detrimental to C.G.F., Jr., we do not doubt that C.G.F., Jr. loves Mother. On visits, Mother brings gifts and food, affection which any child would enjoy. We also do not doubt that Mother loves C.G.F., Jr. To that extent, a bond exists. However, our Superior Court has remined that:

> Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and *we must weigh that injury against the damage that bond may cause if left intact.* Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

*In re T.S.M.,* 620 Pa. 602, 631, 71 A.3d 251, 268–69 (2013).

We do not find sufficient evidence of a healthy bond. Any bond which exists between C.G.F., Jr. and Mother may actually impede his potential for well-being. We conclude that more damage than benefit will occur to C.G.F. by maintaining any bond which exists with Mother.

Finally, the fact that no adoption resource currently exists for C.G.F., Jr. does not preclude us from finding that termination of Mother's rights serves his best interests of C.G.F., Jr. Concerns that no pre-adoptive home exists are outweighed by Mother's failure to remedy parental incapacity and C.G.F. Jr.'s need for permanence and stability. *See e.g. T.D.,* 949 A.2d at 920–23; *J.M.,* 991 A.2d at 325 (quoting *In re Adoption of R.J.S.,* 901 A.2d 502, 513 (Pa.Super.2006).

For these reasons, the Decree of termination of Parental Rights should be affirmed.

BY THE COURT:

JOHN F. CHERRY
PRESIDENT JUDGE

July 8, 2022

Distribution:

Jennifer Grimes, Esq., Dauphin County Social Services For Children and Youth

*(Counsel to Agency)*

Sarah Hoffman, Esq., PO Box 4468, Harrisburg, PA 17111-0468

*(Appointed Counsel to Child)*

Joy Waters, Esq., 91 Sylvan Ridge Road, Harrisburg, PA 17113

*(Guardian ad litem to Child)*

Lisa Watson, Esq., P.O. Box 4061, Harrisburg, PA 17109

*(Appellate Counsel to Mother)*